Filed 10/29/25  In re A.M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | B340692 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent<br><br>      v.<br><br>F.M. et al.,<br><br>      Defendants and Appellants. | (Los Angeles County Super. Ct. No. 24CCJP00416A–C) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cristina Gutierrez Legaspi, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant F.M.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant V.A.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

————————————

The juvenile court found siblings A.M., An.M., and V.M. came within its jurisdiction pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b)(1) and (d) due to their father's sexual abuse of an unrelated child. The parents appeal, contending the jurisdictional findings and removal order were not supported by substantial evidence. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother V.A., Father F.M., and their three daughters, A.M., An.M., and V.M., lived together in a home with an unrelated child, R.G., for whom V.A. was caring on a long-term basis while R.G.'s father was incarcerated. R.G. referred to V.A. as her mother, F.M. as her father, and the other children as her sisters.

In December 2023, R.G., age 12, disclosed she had been sexually abused by M.H., a man she considered to be her grandfather.[2] The disclosure was prompted by V.A., who had learned that M.H. had abused a cousin of R.G.'s and asked R.G. if M.H. had done anything to her. At first, R.G. denied the abuse because she was scared that no one would believe her, but after crying at school, she told a teacher that M.H. had abused her. The allegation was reported to the police, who began investigating. R.G. underwent a forensic interview on December 13, 2023, concerning the abuse by M.H.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] M.H. was actually the spouse of a person who took care of R.G. while V.A. attended school.

In January 2024, R.G. sent an e-mail to two of her teachers stating she had been abused by both M.H. and F.M. R.G. confirmed the allegations to a school counselor.

R.G.'s disclosure of abuse by F.M. was reported to the Department of Children and Family Services (DCFS) on January 11, 2024.) It was reported to DCFS that R.G. said F.M. sexually touched her on multiple occasions. R.G. stated that since she was a first grader, F.M. had been going into her bedroom while she was there with her sister and touching her (R.G.) inappropriately. The abuse happened when V.A. was at work. R.G. said the abuse temporarily stopped when she was in the second grade because V.A. did not work that year, but resumed when she was in the third, fourth, and fifth grades. According to R.G., F.M. had touched her five times in her bedroom during the previous year. R.G. said she was scared and did not know what to do. She was afraid to tell V.A. about the abuse because F.M. got mad at small things and took his anger out on the sisters.

A DCFS social worker interviewed R.G., V.A., and F.M. on January 11, 2024. R.G. reported that when she was in the first grade, F.M. touched her while she was laying on the couch watching a movie. R.G. said F.M. touched her breast under her clothes, but she would not elaborate about the incident. R.G. also reported that when she was in fourth and fifth grades, F.M. "touched [her] breast under the clothes and the lower area, front and back, under clothes." No one else was present at the time. She did not remember how frequently the abuse occurred, and she did not elaborate further about what had taken place. R.G. did not tell Mother about F.M. touching her inappropriately, as she was scared to say anything. R.G. had not seen F.M. touch his daughters inappropriately. R.G. told the social worker she was

3

not afraid of V.A. or F.M. and felt safe at home with them. The social worker described R.G.'s demeanor as "tranquil and respectful."

V.A. said she believed R.G. and would protect R.G. and her children, but she also disputed R.G.'s account. V.A. said, "I don't discredit [R.G.], but I will not say something that is not true. I'm dedicated to the family. I go out with all the kids. I talk to them about not allowing anyone touching them inappropriately. I'm very open in regards to sexual abuse." V.A. said she never went out and was always home, and she had been home since she was pregnant with her oldest child. She said she had worked during the year R.G. was in the first grade. V.A. said, "I will cut all ties with anyone who would hurt my children, and although [F.M.] has never given me no reason to believe he has done something wrong, my children come first. I did not see signs, and I didn't see that happening. I was molested as a kid myself, and I am very vigilant and paranoid, because I have girls, and I don't want them to go through any of that harassment and/or abuse." V.A. said her daughters had not disclosed any inappropriate touching by F.M.

F.M. told DCFS he had never touched R.G. or his daughters inappropriately or sexually. He agreed to leave the home until the investigation was completed. V.A. and F.M.'s daughters, ages four, three, and one, were too young to make meaningful statements regarding the allegations.

On January 12, 2024, V.A. sent a text message to DCFS stating R.G. had recanted her allegation against F.M. According to V.A., R.G. "woke up this morning crying saying she made it up, she lied[,] that [F.M.] never touched her. She wanted my attention and the attention she got from us when she told us

4

about [M.H.] . We did more alone time with her without the younger kids and she liked that and wanted that." A police officer confirmed to DCFS that R.G. had admitted making up the allegations against F.M. and that he had not touched her breast or vagina. R.G. told the police she did not feel uncomfortable around F.M., she trusted him, and she had never seen him touch her siblings inappropriately.

On January 23, 2024, R.G. underwent a forensic interview concerning the allegations involving F.M. When asked why she was being interviewed that day, she responded, "Today, it's kind of about my dad but what my dad did I probably was confused with my grandpa because what I experienced with my grandpa was kind of my whole life, so what he did I probably got confused with my dad." R.G. told the interviewer what M.H. had done, but said she did not want to go into "full detail" because she would "probably break down or get really uncomfortable."

After exploring the abuse by M.H., the interviewer asked R.G. what had happened with F.M. "Nothing happened with my dad," said R.G. "It's probably because I got confused [because] me and my dad we hang out a lot and I know my dad would never do anything like that to me." She acknowledged that she had said F.M. had sexually touched her, and when asked to describe that, she said, "Probably what my grandpa did, like rub on me."

"[W]hat would he have used to rub on you?" the interviewer asked.

"Like his arms, his hands," responded R.G. The interviewer asked where that would happen, and R.G. said, "What I would think would happen, because my grandpa always came over so I would get confused with him and my dad but it would be in my bedroom."

5

When asked how the "stuff about dad" came up, R.G. answered, "I don't exactly remember. It was a long time ago, probably like in fifth grade and both my parents were home and my grandpa. And I never really knew [because] my dad would come in my room all the time to help me clean my room [because] my room was always the messy one. But I think that's when I got confused."

R.G. told the interviewer that she had reported the abuse by F.M. to two of her teachers by e-mail. When asked what she told them, R.G. said, "Probably that I was just sexually touched." She then told a school counselor "mainly about my grandpa and how I probably, and about my dad too."

The interviewer asked R.G. what had happened since she disclosed abuse by F.M. R.G. said that since then she had barely seen F.M., and only on weekends when V.A. was present. This made her feel "[p]retty sad" because she and F.M. had a good relationship. The interviewer asked how R.G. felt when the interviewer asked about F.M., and R.G. answered, "My feelings around Dad are pretty sad because after everything about my dad we haven't talked as much you know and me not talking with my dad is sad because me and my dad talk a lot." She feared F.M. would be mad at her for saying anything if it ruined their relationship.

The forensic interviewer wrote that R.G. "**provided consistent statements about sexual abuse by [F.M.]**, which included being 'rubbed' on her body (i.e. arms, back, back lower part/buttocks) while in her bedroom. [R.G.] minimized [F.M.'s] actions, stating that he entered her bedroom when he would help her clean up. She also attempt[ed] to justify his actions, stating that her 'dad would never do that.' **It should be noted that**

**this evaluator remains concerned for sexual abuse by [F.M.]**. [R.G.] expressed feelings of responsibility for the shift in the family dynamics and in her relationship with [F.M.]. She also expressed feelings of sadness since these shifts occurred. [R.G.'s] recantation and minimization are unsurprising given that her initial disclosure was elicited and not spontaneous—as in, she did not make an independent decision that she was ready to disclose and seek help." The interviewer observed that "the mental and emotional distress caused by the abuse is excessive, as evidenced by [R.G.'s] feelings of fear, the thought that she would not be believed if she disclosed the abuse, her feelings and statements of sadness, her feelings of guilt and responsibility for the abuse and the changes in her relationship with [F.M.], and her depressive feelings (i.e. sadness, sleeping often, self-isolating)." The forensic interviewer believed R.G. "**most likely recanted when confronted about the situation as she feels that her life changed when she mentioned her father sexually touched her, which was why she was trying to defend him with statements of feeling as if she was confusing the situation with grandfather and her father**."

After the forensic interview, R.G. underwent a forensic medical examination, but the extent of the examination was limited by R.G.'s refusal to undergo a genitourinary examination or to change into an examination gown.

DCFS filed a dependency petition concerning R.G. That petition is not at issue in this appeal. The relevant petition for this appeal is the petition filed on February 6, 2024, alleging pursuant to section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse) that F.M. sexually abused R.G. by fondling her breasts and lower body, and that the sexual abuse of R.G. by

7

F.M. endangered the physical health and safety of A.M., An.M., and V.M., created a detrimental home environment, and placed A.M., An.M., and V.M. at risk of serious physical harm, damage, danger and sexual abuse. No allegations were made against V.A. in the petition.

On February 11, 2024, V.A. told DCFS that R.G. recanted the day after she made her accusations and said "she was missing the attention she got when she was with [M.H]. I have three smaller kids who unfortunately are more active and require more attention. Sometimes [R.G] gets pushed to the back a little. She also missed her mom." V.A. did not believe F.M. had abused R.G., stating, "I don't get any of that vibes from him." V.A. thought R.G.'s claim of sexual abuse "was a cry for attention."

On February 26, 2024, F.M. denied abusing R.G. The social worker asked F.M. why he thought R.G. made her allegation against him. F.M. replied, "I'm not sure. Not sure if it's confusion with the grandpa's case. Not sure if someone talked to her."

On August 12, 2024, the juvenile court found true the allegations of the dependency petition. The court stated it believed F.M. had abused R.G. The court acknowledged R.G. had recanted but stated its belief that "recantation is part of trauma that children who are victims of sexual abuse display. It's very noteworthy to this child recanting and saying she was afraid [F.M.] would be mad at her because she disclosed, lends credibility to her initial reports. She does not want to disappoint him. She doesn't want to anger him for fear that these actions will happen again."

The court noted R.G.'s account of F.M.'s abuse was less descriptive than her description of M.H.'s abuse, but opined that this was because R.G. was "interviewed again and again." The court observed that F.M.'s daughters were the same age as R.G. was while she was being abused by F.M., and said, "This court believes that the abuse happened and these children are at risk of imminent harm."

A.M., An.M., and V.M. were declared dependents of the juvenile court pursuant to section 300, subdivisions (b) and (d). The court removed them from F.M.'s custody, released them to V.A., granted F.M. monitored visitation, and ordered him to participate in various programs and services. The court ordered family maintenance services and a sexual abuse awareness program for V.A.

F.M. and V.A. appealed. While the appeal was pending, the juvenile court terminated dependency jurisdiction over the children.[3]

## DISCUSSION

### I. Mootness

Respondent asserted in their briefing that the appeal from the order removing the children from F.M.'s custody was moot because the trial court returned the children to him and terminated dependency court jurisdiction. We asked the parties[4]

---

[3]   We grant Respondent's request for judicial notice of the juvenile court's May 12, 2025 minute orders. (Evid. Code, §§ 452, 459, subd. (a); *In re M.B.* (2022) 80 Cal.App.5th 617, 627.)

[4]   Although V.A. was non-offending, she has appealed from the judgment. Her briefing on appeal consists solely of joinders in F.M.'s arguments. "Appellate counsel for the party purporting

9

to advise this court whether the entire appeal should be dismissed as moot in light of the termination of dependency court jurisdiction over the children. We have read and considered the parties' submissions.

We conclude this appeal has been mooted by the termination of dependency jurisdiction. A case becomes moot when events render it impossible for a court, if it should decide the case in favor of the appellant, to grant any effective relief. (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) For relief to be effective, the appellant must complain of an ongoing harm that is redressable or capable of being rectified by the outcome appellant seeks. (*Ibid.*) Here, because the court terminated jurisdiction over the children and released them to their parents, the jurisdictional finding has not formed the basis for any order that is now adversely affecting or curtailing F.M.'s rights. (See *id.* at pp. 277–278 [case not moot where jurisdictional finding affects

---

to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as waived, and pass it without consideration. [Citations.]" ' [Citation.] 'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364.) As V.A. makes no independent claims, does not demonstrate error or prejudice as to her, and provides no particularized argument in support of her ability to seek relief on the grounds raised by F.M., we need not discuss her appeal further.

custody rights, curtails contact with child, or has resulted in dispositional orders that continue to adversely affect a parent].) Even if F.M. is successful on appeal in his challenge to the jurisdictional findings and dispositional orders, there is no effective relief we can provide to him.

F.M. concedes his appeal of the dispositional order has been mooted by the termination of jurisdiction but contends his challenge to the jurisdictional findings is not moot. He claims he "continues to suffer ongoing harm, as the jurisdictional findings are prejudicial to him, and this harm is capable of being rectified by the outcome that [he] seeks." As this conclusory assertion is not supported by any discussion or explanation of what ongoing harm or prejudice he is suffering as a result of the jurisdictional findings, F.M. has failed to identify "a tangible legal or practical consequence of the jurisdictional finding that would be remedied by a favorable decision on appeal." (*D.P.*, *supra*, 14 Cal.5th at p. 278.)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P.*, *supra*, 14 Cal.5th at p. 282.) F.M. asks this court to exercise our inherent discretion to rule on the appeal's merits even if it is moot, arguing the findings were egregious and could impact any future dependency referrals or proceedings. He claims both parents promptly complied with their case plans, resulting in jurisdiction terminating, and argues their diligence should not result in the dismissal of the appeal. While F.M.'s argument is conclusory, vague, and largely speculative, in an abundance of caution we exercise our discretion to review his appeal on the merits.

11

## II.    **Jurisdictional Findings**

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).) Under this standard of review, we examine the record in the light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*Ibid*.) We " ' "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

The evidence is sufficient to support the court's findings. R.G. disclosed that on multiple occasions over several years, when V.A. was at work, F.M. sexually abused her. The abuse began when R.G. was in the first grade, when F.M. touched her breast under her clothes as she lay on the couch watching a movie. As she got older, F.M. began touching her genital area under her clothes. R.G. recanted her statement, telling the forensic interviewer she must have been confused between M.H. and F.M., but the juvenile court found R.G.'s initial reports more credible than her awkward recantation. We defer to the juvenile court's determination of the credibility of both the evidence and the witnesses. (*R.T.*, *supra*, 3 Cal.5th at p. 633.) As for risk to F.M.'s daughters, there was evidence R.G. was abused in the presence of one of the daughters, and at the time of the jurisdictional hearing, F.M.'s oldest daughter was five years old, an age similar to R.G.'s age when the abuse began.

Section 355, subdivision (b) provides that hearsay evidence contained in an agency's social study "is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." Section 355, subdivision (c)(1) makes such hearsay evidence insufficient "by itself" to support a jurisdictional finding "[i]f a party to the jurisdictional hearing raises a timely objection" and the agency fails to show an exception listed in the statute applies. Here, F.M. did not object to the admission of R.G.'s statements at the jurisdictional hearing; accordingly, pursuant to section 355, they are sufficient by themselves to support the jurisdictional finding.

F.M. argues R.G.'s out-of-court statements were insufficient to support the jurisdictional findings because they were uncorroborated hearsay statements that were later recanted, and they lacked the necessary indicia of reliability. F.M.'s argument relies on *In re I.C.* (2018) 4 Cal.5th 869 (*I.C.*) and *In re Lucero L.* (2000) 22 Cal.4th 1227 (*Lucero L.*), in which the California Supreme Court imposed requirements beyond those imposed by section 355 on hearsay statements of abuse made by truth-incompetent children—i.e., those who are too young to testify due to their inability to distinguish truth from falsehood. (*I.C.,* at p. 875; *Lucero L.,* at pp. 1244–1248 (plur. opn. of Mosk, J.); *Lucero L.,* at pp. 1250–1251 (conc. opn. of Kennard, J.).) While "a child's out-of-court reports of parental abuse are admissible in evidence [at a jurisdictional hearing] regardless of whether the child is competent to testify in court," pursuant to section 355, subdivision (b) (*I.C.,* at p. 875), the Supreme Court held a jurisdictional finding may not be based *solely* on such a truth-incompetent child's hearsay statements without violating due

13

process, unless " ' "the time, content and circumstances of the statement" ' " bear sufficient indicia of reliability. (*Id.* at pp. 887, 890; *Lucero L.*, at pp. 1231, 1244–1248 (plur. opn. of Mosk, J.); *Lucero L.,* at pp. 1250–1251 (conc. opn. of Kennard, J.).)

Here, R.G. was 12 years old when she reported F.M. sexually abused her. F.M. does not argue she was truth-incompetent. The juvenile court did not find, nor is there any evidence, that R.G. was unable to distinguish truth from falsehood. Given that F.M. did not call R.G. to testify at the jurisdictional hearing, much less question her competence to differentiate truth from falsehood, the record does not support his claim that her out-of-court statements were subject to additional scrutiny under *I.C.* and *Lucero L.*

F.M. argues the evidence did not support two statements made by the court while explaining the basis for its finding that he had sexually abused R.G., but on appeal we review the juvenile court's ruling, not its reasoning. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) F.M.'s arguments, moreover, are basically a claim that the juvenile court should have weighed the evidence differently. First, he contends the record does not show that R.G. had been interviewed "again and again," which the court cited as a reason that her allegations against F.M. were less detailed than those she had made against M.H. However, the evidence showed R.G. had been interviewed twice about her allegations against F.M. in addition to discussing them with her school counselor, and these conversations took place within weeks of two interviews concerning her allegations against M.F.

Second, F.M. claims the court's conclusion that R.G. recanted because she did not want to anger F.M. for fear that his actions would happen again was not supported by the evidence,

14

and he points to evidence in the record that R.G. and F.M. had a good relationship and she felt safe with him.  There was evidence in the record that F.M. and R.G. had a positive relationship, but R.G. also told DCFS she was afraid to disclose the abuse because F.M. became angered by small things and took it out on the sisters, and during the forensic interview she mentioned her fear that F.M. would be mad at her for saying something.  The court reasonably concluded R.G.'s fear of F.M.'s anger for making disclosing the abuse "len[t] credibility to her initial reports," and that this fear and her desire not to disappoint him signaled that her recantation was "part of trauma that children who are victims of sexual abuse display."  " 'In evaluating the evidence, we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence.' " (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270.)  " ' "We do not consider the credibility of witnesses or reweigh the evidence." ' " (*In re Gilberto G.* (2024) 105 Cal.App.5th 52, 62.)

F.M.'s next claim is also a request that we reweigh the evidence: he argues there was no substantial evidence to support the findings because there were no other witnesses to F.M.'s sexual abuse of R.G., and V.A. was a vigilant parent who had not seen any problematic conduct by F.M.  "Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court.  Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*).)  We decline F.M.'s invitation to reweigh the evidence and substitute our judgment for that of the juvenile court.

15

Finally, in an argument specific to the court's finding under section 300, subdivision (d) that the children were placed at risk of sexual abuse by F.M.'s abuse of R.G., F.M. points out that his three-year-old daughter said she felt safe at home and that no one was hurting her, disclosed no abuse or neglect, and was described by her mother as a happy and healthy child. He asserts R.G.'s initial statement to the social worker lacked detail and was immediately recanted, V.A. was a protective parent who would cut ties with anyone who hurt her children, F.M. positively described R.G., DCFS described both F.M. and V.A. as caring for their children a great deal, and there was no evidence in the record of anyone pressuring R.G. to recant. At best, this argument demonstrates the juvenile court could have resolved the evidentiary and credibility conflicts differently, but it does not show there was no substantial evidence to support the findings. Moreover, "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                        STRATTON, P. J.

We concur:


VIRAMONTES, J.


RUBIN, J.*

---

\*     Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.